Janice SORON, Plaintiff,

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON (a/k/a Liberty Mutual); Fleet Boston Financial Group; and Fleet Boston Long Term Disability Plan, Defendants.**

**No. 02–CV–1514.**

United States District Court,
N.D. New York.

May 20, 2004.

Saunders, Kahler & Locke, LLP (Raymond A. Meier, Esq., of Counsel), Utica, NY, for Plaintiff.

Bond, Schoeneck & King, PLLC (Brian J. Butler, Esq., of counsel), Syracuse, NY, for Defendant Liberty Life Assurance Company of Boston.

Edwards & Angell, LLP (George P. Kostakos, Esq., of Counsel), Providence, RI, for Defendants Fleet Boston Financial Group and Fleet Boston Long Term Disability Plan.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

On March 3, 2003, plaintiff Janice Soron ("plaintiff") filed an amended complaint against defendants Liberty Life Assurance Company of Boston ("Liberty"), Fleet Boston Financial Group ("Fleet Boston"), and Fleet Boston Long Term Disability Plan, alleging that Liberty improperly denied her application for long-term disability benefits (*first* cause of action), and seeking

reinstatement of certain employee benefits that were subsequently terminated by Fleet Boston (*second* cause of action).

Both plaintiff and defendants have filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Oral argument was heard on May 14, 2004, in Utica, New York. Decision was reserved. An administrative record surpassing 600 pages in length has been carefully reviewed.

## II. FACTUAL BACKGROUND

Plaintiff was employed by a subsidiary of Fleet Boston at various points from November 4, 1985, to November 15, 2001. Under a long-term disability benefits policy, administered and payable by Liberty, a participant was entitled to benefits if, *inter alia*, she was "unable to perform all of the material and substantial duties of [her][own] occupation on an Active Employment basis because of an Injury or Sickness." (Docket No. 18, Attach. 1, Ex. A, § 2.)

In September 1999, plaintiff was approved for short-term disability benefits based on the onset of symptoms of rheumatoid arthritis. On March 12, 2000, her short-term benefits expired and she applied for long-term disability benefits. In support of the application, plaintiff submitted notes from her treating physician, Dr. Ute Dreiner, that indicated she had rheumatoid arthritis, and was completely disabled from performing the essential duties of her position.

Thereafter, Liberty retained Dr. Donald Abbott to review the submitted medical records. On April 18, 2000, he issued a written, 1 1/2 page report questioning the basis for the rheumatoid arthritis diagnosis on the submitted records, and noting that, in any event, the lack of follow-up documentation and x-rays that would properly document the condition.[1]

On *June 20, 2000*, Liberty informed plaintiff that her application for long-term disability benefits was being denied. As support for the decision, the letter stated that "[t]he office treatment notes received from September 1999 through April 2000 from [Dr. Dreiner] have been reviewed by a MD in our managed disability services department," who along with "the claims department" concluded "that there was not sufficient objective medical information supporting total and permanent disability." (Docket No. 18, Attach. 1, Ex. B, Administrative Record, p. 70) ("Admin. Rec. at ___"). The letter neither enclosed Dr. Abbott's written report nor advised plaintiff that she could request it. In fact, Dr. Abbott's name was not even mentioned.

In July 2000, plaintiff requested that Liberty reconsider its determination. In support, plaintiff submitted extensive narratives from both herself and Dr. Dreiner, detailing her condition and symptoms. A medical examination was scheduled by Liberty and performed by Dr. Ze've Weitz, a rheumatologist, who diagnosed plaintiff with "rheumatoid arthritis with low-grade activity" and a "[s]econdary diagnosis [of] fibromyalgia." (Admin. Rec. at 438.) While it was noted that "there is no evidence of an acute significant inflammatory arthritis" and that "[m]ost of her complaints are probably due to the secondary fibromyalgia," Dr. Weitz opined that plaintiff was "disabled from her usual line of work, which include[d] using a keyboard and standing long hours on her feet." (Admin. Rec. at 438.)

On November 16, 2000, Liberty sent a fax to the consulting firm that hired Dr. Weitz, indicating that the report was "not

1. Dr. Abbott appears to the be the only physician (out of at least five) to question whether plaintiff had rheumatoid arthritis.

a very good independent medical exam," and enclosing some questions for the doctor along with plaintiff's job description. (Admin. Rec. at 555.) By letter dated November 21, 2000, Dr. Weitz responded to the questions, reaffirming the earlier diagnoses and opinion. (Admin. Rec. at 422.)

In early December 2000, Liberty informed plaintiff that although it needed additional information to determine her eligibility, it was granting her long-term disability benefits retroactive to March 12, 2000, and continuing until its processing of her application was completed. Also during December 2000, Liberty received the first of three investigative reports from a private surveillance firm it had engaged to videotape and document plaintiff's physical activities. (Admin. Rec. at 523.)

Plaintiff thereafter underwent, at Liberty's request, a transferrable skills analysis and a functional capacity evaluation ("FCE"). In the transferrable skills analysis, it was noted that a medical peer review was undertaken, at Liberty's request, by Dr. Tanya Lumpkins in January of 2001, who opined that plaintiff could perform her job with certain lifting, standing/walking, and typing restrictions. The physical therapist who performed the FCE concluded on April 12, 2001, that plaintiff was "functioning in the sedentary work classification category for an 8 hour period."[2] (Admin. Rec. at 483.) She noted that plaintiff demonstrated on an occasional basis a "tolerance of walking, standing, stair climbing, overhead reaching, forward reaching, pushing/pulling, crawling, kneeling, stopping and crouching," and on a frequent basis a tolerance of "sitting, trunk bending, squatting, and trunk twisting." *Id.*

On May 12, 2001, and July 18, 2001, after videotaping and documenting surveillance on plaintiff, the private firm engaged by Liberty issued its second and third reports.

Dr. Gale Brown, again at Liberty's request, reviewed plaintiff's medical records and documentation, and issued a written 8–page report on October 1, 2001, regarding whether she was disabled from performing her job functions. Dr. Brown found that the "medical evidence substantiat[ed]" the rheumatoid arthritis diagnosis, and recommended standing/walking and wrist/hand activity restrictions, as well as "[p]osition changes as necessary" and the "[u]se of wrist splints." (Admin. Rec. at 403.) Dr. Brown concluded that the record supported that plaintiff could perform the essential duties of her position with the recommended restrictions. As support for her conclusion, Dr. Brown cited Dr. Dreiner's opinion and physical exam findings, as well as the medical exam performed by Dr. Weitz.

On *October 18, 2001,* Liberty informed plaintiff it was again denying her long-term disability benefits application. The letter explicitly cites as support for its conclusion plaintiff's medical record, Dr. Brown's report, the FCE, and a portion of Dr. Weitz's report. Dr. Weitz's answers to Liberty's follow-up questions are not cited or included, nor is his belief that plaintiff was totally disabled from her usual line of work, which included prolonged standing and substantial typing duties. Neither the surveillance videotapes/reports nor Dr. Lumpkins's peer review are explicitly identified as support for the denial. The letter neither provides copies of the evidence relied upon in reaching the decision—Dr. Brown's report, the FCE, and Dr. Weitz's

**2.** Plaintiff's job description stated that she "generally works 9–10 hours/day." (Admin. Rec. at 484.)

report—nor advises plaintiff she can request copies of the same or of the other documentation it had in its possession before rendering the decision.

On November 6, 2001, plaintiff again requested, this time through retained counsel, that Liberty reconsider its denial of her long-term disability benefits application. In counsel's letter, copies of any independent medical examinations and the FCE were demanded. On December 5, 2001, counsel wrote Liberty again demanding the examinations and FCE. Liberty provided the demanded material just over a week later, on December 13, 2001. On January 10, 2002, Liberty informed plaintiff that it would need more time to process her application.

On March 23, 2002, plaintiff's file—including correspondence and records from her and Dr. Dreiner, Dr. Brown's review, Dr. Weitz's report, Dr. Abbott's review, the FCE, the transferrable skills analysis, and the three surveillance reports—was reviewed, again at the request of Liberty, by Dr. Richard Herman.[3] He noted that "[t]here is little debate as to whether or not [plaintiff] has Rheumatoid Arthritis," and a general consensus among all medical professionals with the exception of Dr. Dreiner that should plaintiff return to work, she should avoid "repetitive hand activity [and] prolonged standing." (Admin. Rec. at 394.) Dr. Herman concluded that plaintiff "would appear to have the stamina to work forty hours a week in a sedentary occupation." (Admin. Rec. at 395).

One week later, by letter dated *April 1, 2002*, Liberty reaffirmed, for the final time, its conclusion that plaintiff was not eligible for long-term disability benefits. The letter stated that Liberty "reviewed the medical information from [plaintiff's] physician(s), an [FCE], independent medical peer review reports[,] [and] then compared [her] restrictions and limitations outlined in the medical information to the requirements of [her] occupation of Administrative Assistant." (Admin. Rec. at 397.) This letter, more extensive than the earlier two, then referenced and at times quoted from Dr. Brown's review, the FCE, and Dr. Weitz's report. The letter disclosed Dr. Weitz's conclusion that she could not work because of the prolonged standing and repetitive typing required in her job, but noted that he did not find swelling or inflammation. The letter noted also that the medical experts, with the possible exception of Dr. Dreiner, all agreed that restrictions relating to standing and hand activity would allow her to perform her "sedentary" job on a full-time basis. The letter also detailed the contents of the surveillance reports. For the first time, the letter stated that plaintiff "may request, free of charge, copies of all documents relevant to [her] claim." *Id.* at 399.

On May 6, 2002, counsel for plaintiff wrote Liberty demanding "copies of all documents relevant to [plaintiff's] claim, including the surveillance tapes of May and July 2001, and a full copy of her policy." On May 22, 2002, counsel for plaintiff reiterated the demand. On May 30, 2002, Liberty sent counsel her file and a copy of the long-term disability benefits policy. On June 13, 2002, Liberty sent plaintiff's counsel copies of the relevant surveillance tapes. Thus, over two months after Liberty's final decision denying her claim for long-term disability benefits, plaintiff finally came into possession of

---

3. In total, from the time it received Dr. Dreiner's extensive archive of plaintiff's medical records, to the time it issued a final decision denying plaintiff's claim for benefits, Liberty solicited the services of at least five doctors—four (Drs. Abbott, Lumpkins, Brown, and Herman) to review her file, but only one (Dr. Weitz) to personally examine her.

what was apparently Liberty's complete file on her claim.

On December 16, 2002, plaintiff commenced the instant action, amending her complaint on March 3, 2003, to include the second cause of action against Fleet Boston. The pending motions followed.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. N.Y. State Dep't of Corr. Service*, 180 F.3d 426, 436 (2d Cir. 1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, however, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. At that point, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348. Indeed, to withstand a summary judgment motion, the nonmoving party must demonstrate that sufficient evidence exists upon which a reasonable jury could return a verdict in its favor. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. Denial of Benefits—Full and Fair Review

■ Because there is no question that the long-term disability benefits policy grants to Liberty the "authority to determine eligibility for benefits or to construe the terms of the plan," its decision to deny plaintiff's claim for benefits is reviewed for an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) (stating that the plan must contain "either language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording"). An administrator abuses its discretion when it fails to afford a claimant a "full and fair review" of its decision to deny her claim. *See Crocco v. Xerox Corp.*, 137 F.3d 105, 108 (2d Cir.1998) ("[W]e affirm the district court's judgment that Nazemetz did not provide a 'full and fair review' of APM's certification decision (and hence, that Nazemetz's ratification of APM's decision was arbitrary and capricious")); *Shutts v. First Unum Life Ins. Co.*, 310 F.Supp.2d 489, available at 2004 WL 615134, at 498–501 (N.D.N.Y.2004); *Cejaj v. Bldg. Serv. 32B–J Health Fund*, No. 02 Civ. 6141, available at 2004 WL 414834 (S.D.N.Y. Mar. 5, 2004).

■ In her *first* cause of action, plaintiff claims Liberty's denial of her claim for long-term disability benefits was an abuse of discretion because, *inter alia*, it failed to disclose the evidence supporting the decision, in violation of her right to a full and fair review under 29 U.S.C. § 1133(2). Pursuant to 29 U.S.C. § 1133(2), a participant whose benefit claim has been denied must be given "a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision de-

nying the claim." "The purpose of the full and fair review requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir.2000) (internal quotations and citations omitted). "At the very least, a full and fair review requires that the fiduciary inform the participant or beneficiary of the evidence that the fiduciary relied upon and provide an opportunity to submit written comments or rebuttal documents." *Lidoshore v. Health Fund 917*, 994 F.Supp. 229, 236–37 (S.D.N.Y.1998) (internal quotations and citation omitted).

Encompassed within a claimant's right to a full and fair review are the various duties and obligations bestowed upon administrators by 29 C.F.R. § 2560.503–1. Liberty is correct that the version of § 2560.503–1(f) in effect at all times relevant to this case provided only that a denial notice contain statements relating to four areas: "(1) The specific reason or reasons for the denial; (2) Specific references to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." *Id.*

However, subsection (g) of the same regulation appears to have been intended to supplement subsection (f)(4), and the mandates within were without question part and parcel of an administrator affording a claimant a full and fair review. Specifically, subsection (g)(1) provided that every internal appeals procedure must allow "a claimant or [her] duly authorized representative [to]: (i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing." *Id.* § 2560.503–1(g)(1). Thus, per the controlling federal regulation, plaintiff did indeed have an affirmative right to review documents pertinent to her claim that Liberty has in its possession.

This is confirmed by the case law. Judge Ellen B. Burns, in an opinion the relevant portion of which was affirmed by the Second Circuit, quoted a Third Circuit decision it called "[t]he most widely accepted criteria for what constitutes a full and fair review under ERISA" for the proposition that the plan administrator " 'must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence.' " *Crocco v. Xerox Corp.*, 956 F.Supp. 129, 139 (S.D.N.Y. 1997), *aff'd in relevant part*, 137 F.3d 105, 108 (2d Cir.1998) (quoting *Grossmuller v. Int'l Union, UAW*, 715 F.2d 853, 857–58 (3d Cir.1983)). More recent courts, citing *Crocco*, *Grossmuller*, or even the Second Circuit's opinion, have agreed. *See, e.g., Connell v. Guardian Life Ins. Co. of Am. Severance Plan*, No. 02 Civ. 7522, available at 2003 WL 21459563, at *3 (S.D.N.Y. June 24, 2003); *Neely v. Pension Trust Fund of Pension, Hospitalization & Benefit Plan of Elec. Indus.*, No. 00 CV 2013, available at 2003 WL 21143087, at *8 (E.D.N.Y. Jan. 16, 2003); *Dittman v. Dyno Nobel, Inc. Defined Benefit Pension Plan I*, No. 97–CV–1724, available at 1999 WL 727464, at *10 (N.D.N.Y. Sep. 10, 1999); *DeVere v. Northrop Grumman Corp.*, No. 97–CV–3724, available at 1999 WL 182670, at *8 (E.D.N.Y. Mar. 24, 1999).

■ In this case, whether plaintiff had a right to review all pertinent documents is irrelevant unless Liberty had a duty to inform her of that right in the June 20,

2000, and/or October 18, 2001, denial letters. If plaintiff had the right, but had to make a request in order to invoke it, it is arguable that Liberty did not deprive her of a full and fair review, as it disclosed that which plaintiff specifically requested after the October 18, 2001, decision—Dr. Weitz's report and the FCE—and after the final decision—the entire claim file. If, however, Liberty was under a duty to inform plaintiff of the right, then plaintiff was deprived of a full and fair review because she was not so informed in the June 20, 2000, and/or October 18, 2001, decisions.

It is arguable that the regulation in effect at the time itself provides the answer. In the operative subsection, (g)(1), three rights are listed—the right to request review of a denial, the right to review pertinent documents, and the right to submit written comments. The second right, in issue here, does not list any affirmative action that a claimant needs to take in order to "review pertinent documents." It states only that the second right must be made available. If the drafters of the regulation intended that a claimant needed to take an affirmative step to invoke that right, it is assumed they would have said so, like they did in the case of the first right, which provides that a claimant must be afforded the opportunity to "request" review of an adverse decision. The regulation does not state that a claimant has to make a "request" to review pertinent documents in the administrator's possession.

While the Second Circuit has not had occasion to address this issue—whether the administrator must inform the claimant of her right to review pertinent documents, or whether the claimant must make a request to do so—the Fourth Circuit has, and its analysis and reasoning in that regard are adopted. *See Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 236–37 (4th Cir. 1997). In *Ellis*, the claimant had requested review of the administrator's decision to deny benefits, but it was unclear whether she made the more narrow request to review the pertinent documents. Drawing from the language of 29 C.F.R. § 2560.503–1(f)(4)—which mandates that a denial notice disclose to the claimant the appropriate steps for having a denial reviewed—the court held that "[a] plan administrator or fiduciary must inform a claimant that, should she desire to submit her claim for review following an initial denial, she is entitled to review the pertinent documents upon which the initial decision was predicated." *Id.* at 237.

It could be argued that the drafters of the regulation themselves acknowledged this with the enactment of the current version of 29 C.F.R. § 2560.503–1. In the current regulation, a distinction is made between the required contents of an initial denial and a denial on review, both of which are more extensive than the regulation in effect at all times relevant to this case. In an initial denial, an administrator must include the first three requirements of subsection (f) of the prior regulation, plus an expanded version of the fourth requirement and two additional requirements. *Id.* § 2560.503–1(g)(1)(i)–(vi). A denial on review, however, must now be accompanied by "[a] statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." *Id.* § 2560.503–1(j)(3). A document is considered "relevant" if it: "(i) Was relied upon in making the benefit determination; (ii) Was submitted, considered, or generated in the course of making the benefit determination; (iii) Demonstrates compliance with the administrative processes and safeguards required ... in making the benefit determination; or (iv) In the case of a group health plan or a plan providing dis-

ability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied ... benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination." *Id.* § 2560.503–1(m)(8)(i)–(iv).

Because of the current regulation's distinction between an initial denial and a denial on review, however, it could also be argued that the drafters wanted to clarify that claimants have to be advised of their right to review pertinent or relevant documents only in a denial on review, and not in an initial denial. Nevertheless, it is the language of the prior regulation that controls, unilluminated by the current version, and the prior regulation is most properly read to require an administrator to inform a claimant, at whatever level, of her right to review pertinent documents. Neither in the June 20, 2000, initial denial letter, nor in the October 18, 2001, letter denying reconsideration, did Liberty inform plaintiff of her right to "review pertinent documents."

■ In any event, even if it is accepted from Ellis and a fair reading of the prior version of the regulation that Liberty only had a duty to advise plaintiff of her right to review pertinent documents in the October 18, 2001, decision,[4] the conclusion is inescapable that such a duty was breached. After the initial denial and before the October 18, 2001, decision, Liberty had at least the following in its possession: (1) Dr. Weitz's independent medical examination; (2) the questions submitted to Dr. Weitz regarding his report, and the answers he gave; (3) the December surveil-

lance report; (4) Dr. Lumpkin's peer review report; (5) the transferrable skills analysis; (6) the FCE; (7) the May surveillance report; (8) the July surveillance report; and (9) Dr. Brown's peer review report.

Had Liberty informed plaintiff prior to issuing its final decision on April 1, 2002, that she had a right to review pertinent documents, she may well have requested all of the above materials. Instead, Liberty did not so inform plaintiff and she received, only after repeated demands by counsel, Dr. Weitz's independent medical examination and the FCE.

That Liberty did not explicitly identify all of these documents as support for its October 18, 2001, decision does not alter the conclusion that it had a duty to inform plaintiff of her right to review them. As an initial matter, it is unclear whether Liberty named all of the documents upon which it placed reliance in making its decision. Despite having at least nine additional pieces of evidence in its possession before rendering its October 18, 2001, decision (items (1) through (9), *supra*), Liberty explicitly identified only three—Dr. Brown's review, Dr. Weitz's report (but not follow-up answers), and the FCE. Though plaintiff did eventually receive copies of the latter two, she did not receive, and was not advised of her right to receive, Dr. Brown's report, on which heavy reliance was placed by Liberty, or any of the other documents it had in its possession that were allegedly consistent with its decision to deny benefits. It should also be noted that Dr. Brown's

---

4. It should be noted, however, that Liberty in its June 20, 2000, letter may have breached its duty to accurately identify the evidence upon which it relied in making its decision. For example, the letter noted that an "MD in [Liberty's] managed disability services department" had reviewed plaintiff's medical records and concluded "that there was not

sufficient objective medical information supporting total and permanent disability." (Admin. Rec. at 70.) Dr. Abbott, apparently the only "MD" who had reviewed plaintiff's file to that point, was not named, nor was it disclosed that he had issued a written report on the same.

report referenced several documents in Liberty's possession, so had Liberty advised plaintiff of her right to review Dr. Brown's report—on which it did expressly rely—plaintiff may have discharged any duty on her part to request the other materials.

Also worthy of mention is the fact that the final denial letter of April 1, 2002, explicitly cited as support for its conclusion evidence from the first part of 2001 that was not cited in the October 18, 2001, denial letter. The most prominent example of such evidence is the surveillance reports, which were completed on December 22, 2000, May 12, 2001, and July 18, 2001, respectively, but which were not identified as support in the October 18, 2001, denial letter. Thus, it is arguable that evidence pre-dating October 18, 2001, that was identified only in the final denial letter as support for the decision should have been identified in the October 18, 2001, letter, and plaintiff should have been informed of her right to review the same. Were it otherwise, Liberty could simply just disclose one document as authority for its decision, state that all other documents are not inconsistent with this decision, and be forced to reveal its evidence only after a final decision has been rendered. Such is incompatible with the purpose of requiring administrators to develop and claimants to follow an internal appeals procedure, to wit, to allow parties to resolve issues outside of federal court through the free and open exchange of information relevant to a disability benefits claim.

Liberty is quite correct that it does not have an obligation to name in its denial letter every piece of evidence in its possession, and can just rely upon certain docu-ments, but only so long as it possesses no documents contrary to its conclusion. If such documents exist, it has a duty to reconcile their contents with its decision. Such a reconciliation may have become necessary had plaintiff been able to receive and respond to the undisclosed documents. In other words, even if submissions plaintiff made thereafter were not directly aimed at the cited materials, Liberty would have been obligated to respond because such submissions were contrary to the conclusion reached by the cited materials. Whether plaintiff could have mounted opposition to the conclusion by utilizing the information in the undisclosed materials, or whether any contrary submissions would have changed Liberty's decision, are both premature inquiries at this stage. Plaintiff had a right to be informed of her right to review pertinent documents and, if appropriate or possible, attempt to rebut the materials that Liberty merely viewed as cumulative of the cited materials.

Therefore, because it failed to advise plaintiff of her right to review the evidence it had accumulated prior to its April 1, 2002, decision, Liberty abused its discretion by depriving plaintiff of a full and fair review of the denial of her long-term disability benefits. On that ground—*and that ground alone*—plaintiff's motion for summary judgment will be granted.[5]

### C. Remedy

■ "[I]f upon review a district court concludes that [an administrator's] decision was arbitrary and capricious, it must remand to the [administrator] with instructions to consider additional evidence unless no new evidence could produce a reason-

---

5. Because the failure to advise plaintiff of her right to review pertinent documents was an abuse of discretion, her other allegations as to why Liberty arbitrarily and capriciously denied her long-term disability benefits need not be discussed. After Liberty issues a new decision on remand with respect to plaintiff's long-term disability benefits claim, these allegations may be the subject of further motions.

able conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.' " *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) (citations omitted).

■ Here, while Liberty's denial of benefits to plaintiff could, arguably, be supported by the present record, such a record is incomplete, as it is devoid of any rebuttal plaintiff would have had the opportunity to submit had she not been denied a full and fair review. Therefore, whether plaintiff was properly denied long-term disability benefits cannot yet be determined. The matter must be remanded to the administrative level, where plaintiff shall be permitted the opportunity to comment on and/or submit rebuttal documents to the pertinent documents in Liberty's possession that relate to her claim.

### D. Reinstatement of Benefits

The parties agree that, if Liberty's decision to deny long-term disability benefits was proper, plaintiff has no entitlement to reinstatement of other benefits, which ceased when plaintiff was terminated by Fleet Boston after she did not return to work. Resolution of this claim must await Liberty's remand decision on disability benefits. Therefore, defendants' and plaintiff's motions for summary judgment on the *second* cause of action will be denied without prejudice to renew.

## IV. CONCLUSION

By failing to inform plaintiff of her right to review documents pertinent to her claim for long-term disability benefits, Liberty has improperly denied plaintiff a full and fair review and, therefore, abused its discretion. The matter must be remanded to the administrative level so that plaintiff is permitted to respond to the documents in Liberty's possession that purportedly support or are not contrary to its decision, before another decision is made as to her entitlement to long-term disability benefits.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is DENIED without prejudice to renew;

2. Plaintiff's cross-motion for summary judgment is GRANTED in part as to her *first* cause of action and DENIED without prejudice to renew as to her *second* cause of action;

3. Plaintiff's claim for long-term disability benefits is REMANDED to Liberty so as to allow plaintiff a full and fair review of her long-term disability benefits claim in accordance with this opinion;

4. Liberty is to render a decision on remand granting or denying plaintiff long-term disability benefits, and file the same with the Clerk's office, on or before November 1, 2004;

5. The parties may file and serve second summary judgment motions on or before December 1, 2004; and

6. The failure to file and serve a second summary judgment motion shall result in a judgment being entered dismissing the complaint with prejudice.

IT IS SO ORDERED.